1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  **GENGHIS KHAN ALI STEVENSON,** | 07cv0277 W (PCL) |
| 12                              Plaintiff, | **REPORT & RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 13       **v.** | |
| 14  **D. HARMON et al,** | |
| 15                              Defendant. | **(Doc. No. 44)** |

16

**I.**

**INTRODUCTION**

Plaintiff Genghis Khan Ali Stevenson ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with an action filed pursuant to 42 U.S.C. § 1983. The case is before the undersigned pursuant to S.D. Cal. Civ. R. 72.1(c)(1)(c) for Report and Recommendation on Defendant's Motion for Summary Judgment. Fed. R. Civ. P. 56(c).

Plaintiff alleges that Defendants Harmon, Williams, Rush and Velasco violated his civil rights by using excessive force and failing to protect him from imminent harm while he was an inmate at Calipatria State Prison. Defendants now move for summary judgment with respect to all of Plaintiff's claims. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends the Motion be **GRANTED**.

28

## II.

## BACKGROUND

In June of 2006, Plaintiff was a prisoner at Calipatria State Prison housed in the Administrative Segregation Unit (ASU).  (Doc. No. 1 Compl. at 3.)  At that time, Defendants Harmon, Williams and Rush were correctional officers working at Calipatria state prison in the ASU.  (Doc. No. 44-8 Rush Decl. ¶ 1.)  Defendant Velasco was a Sergeant at Calipatria State Prison and supervised Defendants Harmon, Williams and Rush in the ASU.  (Doc. No. 44-5 Velasco Decl. ¶ 2.)  Plaintiff's complaint alleges misconduct on the part of Defendants over the course of two incidents occurring on June 11, 2006.  (Doc. No. 1 Compl. at 3-4.)

### A.   First Incident

Plaintiff alleges that at approximately 8:00 a.m. on June 11, 2006, Defendants Harmon and Williams approached Plaintiff's cell during the shower program.  (Doc. No. 1 Compl. at 3; Doc. No. 1 Ex. A-1.)  Plaintiff's cellmate indicated that he would be taking a shower while Plaintiff stated he would not be taking a shower.  (Id. Ex. A-1.)  Subsequently, in accordance with prison rules and protocol, both inmates were handcuffed prior to the cell door opening.  (Id. Ex. A-2.)  Prison rules and protocol require that prisoners stand facing the back of the cell while a cellmate is escorted out of a cell. (Doc. No. 44-3 Ex. A at 3.)  Defendant Williams then escorted Inmate Stewart out of the cell to the showers.  (Id. at 2.)

As the cell door began to close, Defendant Harmon instructed the tower officer to leave the door open.  (Doc. No. 1 Ex. A-2.)  When Plaintiff asked for a reason, Defendant Harmon stated he was conducting a random search of Plaintiff's cell.  ( Doc. No. 44-3 Ex. A at 4.)  Plaintiff turned around and faced Defendant Harmon during this exchange at which point Defendant Harmon instructed Plaintiff to exit the cell. (Doc. No. 44-3 Ex. A at 5.)  Plaintiff admits he refused to exit the cell and resisted Defendant Harmon's attempts to physically pull him out of the cell when Defendant Harmon came into the cell and pulled on Plaintiff's left arm.  (Id. at 9.)  Plaintiff contends that when he attempted to pull away, Defendant Harmon hit him in his mid-section with the back of the forearm.  (Id.)  Thereafter, Plaintiff bent over to protect himself from further frontal blows and Defendant Harmon gained control of Plaintiff's upper body by

2

07cv0277

wrestling him down and locking the handcuffs tighter behind his back.  (Doc. No. 1 Ex. A-2.)
Defendant Williams, upon hearing the commotion in Plaintiff's cell, finished his escort of
Plaintiff's cellmate to the shower and returned to Plaintiff's cell to assist Defendant Harmon in
subduing Plaintiff.  (Doc. No. 44-7 Williams Decl. ¶ 8.)  Defendant Rush followed and with the
efforts of all three Defendants, Plaintiff was subdued, removed from the cell and escorted to a
holding cell to await a medical evaluation.[1/]  (Doc. No. 44-6 Harmon Decl. ¶ 8-9.)

At this medical evaluation, Plaintiff reported to Medical Technical Assistant (MTA) Bell "I
got beat up."  (Doc. No. 1 Ex. B-1.)  Additionally, MTA Bell noted some dry skin on the left
side of Plaintiff's face and that Plaintiff's pupils were equal and reactive to light which is an
indication of the absence of head trauma, but no further injuries and none that required any
immediate medical treatment.  (Id.; Doc. No. 44-4 Bell Decl. ¶ 7.)  Plaintiff was then escorted
back to his cell by Defendant Velasco with Defendant Rush following.  (Doc. No. 44-5 Velasco
Decl. ¶ 10; Doc. No 44-8 Rush Decl. ¶ 12.)

**B.   Second Incident**

During the escort back to Plaintiff's cell, Plaintiff notified Defendant Velasco that he had
some cuts on his wrist that MTA Bell had failed to notice.  (Doc. No. 44-3 Ex. A at 11.)
Defendant Velasco informed Plaintiff that he would finish the escort back to the cell and call
MTA Bell to the cell to perform another medical evaluation.  (Id.)  Plaintiff contends after being
told he would not be taken back to the medical office, Plaintiff turned around in the direction of
the medical office but did not walk off.  (Doc. No. 44-3 Ex. A at 14.)   However, Defendants
allege that upon seeing Defendant Harmon in the hallway,[2/] Plaintiff broke free of Defendant
Velasco's grasp and lunged at him.  (Doc. No. 44-5 Velasco Decl. ¶ 11; Doc. 44-8 Rush Decl. ¶
14.)   Within seconds, Defendants Harmon, Rush and Williams took Plaintiff to the ground in an

---

1.  Whenever an inmate resists, a medical evaluation is required.  (Doc. No. 44-6 Harmon
Decl. ¶ 8-9.)

2.  Defendants Harmon and Rush were in the same corridor as Plaintiff and Defendant
Velasco on the way back to Plaintiff's cell because they were making lunches there.  (Doc. No. 44-6
Harmon Decl. ¶ 11.)

07cv0277

1  effort to restrict his movement and Defendant Williams applied leg restraints to prevent

2  Plaintiff's further movement while he was taken to a holding cell.  (Doc. No. 44-6 Harmon Decl.

3  ¶ 12.)

4       Shortly thereafter, Plaintiff was examined by MTA Bell a second time where MTA Bell

5  noted "superficial abrasions to bilateral wrists," a "superficial abrasion to left knee" and a "small

6  bump" on the right side of Plaintiff's forehead.  (Doc. No 1 Ex. B-2.)  Regarding this

7  examination, MTA Bell states "there was no dripping blood and no need for any bandaging."

8  (Doc. No. 44-4 Bell Decl. ¶ 9.)   However, Plaintiff was given band-aids applied to both wrists.

9  (Doc. No. 63-3.[3/])

10  **C.  Procedural Background**

11       On February 9, 2007, Plaintiff filed a Complaint against Defendants Harmon, Williams,

12  Rush and Velasco for use of excessive force in violation of his Eighth Amendment rights and

13  against Defendant Velasco specifically alleging failure to protect him from the other named

14  defendants in violation of his Fourteenth Amendment right to due process and equal protection.

15  (Doc. No. 1.)

16       On April 14, 2008, Defendants Harmon, Williams, Rush and  Velasco filed a motion for

17  summary judgment on the ground that there is no dispute of material fact and they are entitled to

18  judgment as a matter of law because Plaintiff cannot show that excessive force was used in the

19  alleged instances.  (Doc. No. 44-2 P. & A. at 6-9.)  Additionally, Defendant Velasco maintains

20  he is entitled to summary judgment because he was not deliberately indifferent to Plaintiff's

21  safety.  (Id. at 9)  Further, all Defendants contend they are immune from suit in their official

22  capacities under the Eleventh Amendment to the United States Constitution.  (Id. at 9-10.)

23       Plaintiff filed an Opposition to the Motion (Doc. No. 56.) and Defendants have replied.

24

25

---

26       3.  Document 63 is the Reply to Supplemental Opposition to Defendants' Motion for
Summary Judgment of which Attachment #3 is Defendants' Notice of Lodgment in which
27  Defendants lodge a videotaped interview of Plaintiff taken shortly after the second examination by
MTA Bell.  Plaintiff also refers to this videotape in his Opposition to Defendants' Motion for
28  Summary Judgment for evidentiary purposes. (Doc. 60 Ex. J.)

07cv0277

1  (Doc. No. 57.)   Plaintiff also filed a Supplemental Opposition to the Motion on July 14, 2008.[4]

2  (Doc. No. 60.)

3  **II.**

4  **STANDARD–RULE 56**

5  Summary judgment is appropriate when there is no genuine issue of material fact and the

6  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Therefore, a

7  motion for summary judgment under Fed. R. Civ. P. 56(c) addresses the sufficiency of the

8  evidence, or of the applicable law, to support the plaintiff's claims.  Warren v. City of Carlsbad,

9  58 F.3d 439, 441 (9th Cir. 1995).  When moving for summary judgment, the moving party bears

10  the initial responsibility of informing the court of the basis for its motion and identifying those

11  "pleadings, depositions, answers to interrogatories, and admissions on file together with the

12  affidavits, if any," which demonstrate the absence of a genuine issue of material fact.  Celotex

13  Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is considered "material" if it might affect the

14  outcome of the suit under applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

15  248-49 (1986).  Thereafter, summary judgment should be entered against a party who fails to

16  show sufficient evidence to establish the existence of an element essential to that party's case.

17  Celotex, 477 U.S. at 322.   "[A] complete failure of proof concerning an essential element of the

18  non-moving party's case necessarily renders all other facts immaterial."  Id. at 323.  In that

19  circumstance, summary judgment should be entered so long as the standard for summary

20  judgment, as stated in Rule 56(c),  is satisfied.  Id.

21  When opposing summary judgment, the nonmoving party must "go beyond the pleadings

22  and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

23  file,'" show specific facts which indicate there is a genuine issue for trial.  Id. at 324.  "On

24  summary judgment, the inferences to be drawn from the underlying facts contained in the

25  materials must be viewed in the light most favorable to the party opposing the motion."  United

26  _____

27  4. On June 13, 2008, the court advised Plaintiff of the requirements for opposing a motion
pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand. v. Rowland, 154 F.3d 952

28  (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

07cv0277

5

States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  The party opposing summary judgment need not establish a material issue of fact conclusively in its favor, rather, it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  However, "[a] genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 23 (1st Cir. 2002).  A dispute is "genuine" as to a material fact only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Moreover, when the party resisting summary judgment is *pro se*, the court "must consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [he] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (holding that allegations contained in a *pro se* plaintiff's verified pleadings must be considered evidence for purposes of summary judgment); see also McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (a verified complaint may be used as an opposing affidavit under Rule 56); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (verified motions admissible to oppose summary judgment); Schroeder v. McDonald, 55 F.3d 454, 460 n.10 (9th Cir. 1995)  (pleading counts as "verified" if the drafter states under penalty of perjury that the contents are true and correct).  However, it should be noted that while the court has discretion in appropriate circumstances to consider materials that are not properly brought to its attention, the court is not required to examine the entire file for any evidence that may establish a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

/ /

/ /

07cv0277

**III.**

**DISCUSSION**

To state a claim under Section 1983, a plaintiff must allege that: (1) the defendant(s) acted under color of state law, and (2) the defendant(s) deprived him of rights secured by the Constitution or federal law.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). "A person deprives another of a constitutional right, where that person does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." Hydrick v. Hunter, 500 F.3d 978, 988 (9th Cir. 2007) (quotations omitted). "[T]he 'requisite causal connection can be established not only by some kind of direct, personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" Id. (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1991)).

Plaintiff's Complaint alleges use of excessive force by Defendants Harmon, Williams and Rush in violation of his Eighth Amendment rights and a failure to protect him from the other named defendants by Defendant Velasco in violation of his Fourteenth Amendment right to due process and equal protection.  (Doc. No. 1.)

**A.   Eighth Amendment:  Excessive Force**

Plaintiff contends excessive physical force was used against him on two occasions: the first time being when Defendant Harmon attempted to physically pull Plaintiff out of his cell after a refusal to exit on his own and the second instance when Defendants Harmon, Williams and Rush attempted to subdue Plaintiff after he began to return to the medical unit on his own directive. (Doc. No. 1 Compl. at 3-4.)

Plaintiff correctly argues that "the unnecessary and wanton infliction of pain...constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977)) (internal quotation omitted).  However, when prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, as Defendants are here, the question turns on whether force

07cv0277

1    was applied in a good faith effort to maintain or restore discipline, or maliciously and

2    sadistically for the purpose of causing harm. Hudson v. McMillian, 503 U.S. 1, 7 (1992); see

3    also Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).   To determine whether the

4    defendant's use of force was "malicious and sadistic," the Hudson Court laid out five factors

5    derived from Whitley v. Albers for courts to consider: (1) the need for application of force, (2)

6    the relationship between the need and the amount of force used, (3) the threat reasonably

7    perceived by the responsible officials, (4) any efforts made to temper the severity of the forceful

8    response, and (5) the extent of injury suffered by an inmate.  Hudson, 503 U.S. at 7 (citing to

9    Whitley, 475 U.S. at 321.) In weighing these factors, "[u]nless it appears that the evidence,

10   viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness

11   in the infliction of pain under the standard," the case should not go to the jury.  See Whitley, 475

12   U.S. at 322.

13        Moreover, under Eighth Amendment standards, the defendant's *subjective* intent comprises

14   an essential element of the affirmative case.  See Wilson v. Seiter, 501 U.S. 294, 303 (1991);

15   Hudson, 503 U.S. at 7 (force is excessive if it is applied "maliciously and sadistically" to cause

16   harm but not if it is "applied in a good faith effort to restore discipline").  Thus, while the court

17   must accept Plaintiff's factual allegations to be true, the assertion of an excessive force claim

18   requires him to do more: he must "'put forward specific, nonconclusory factual allegations' that

19   establish improper motive."  Crawford-El v. Britton, 523 U.S. 574, 598 (quoting Siegert v.

20   Gilley, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in judgment)); Jeffers v. Gomez, 267

21   F.3d 895, 911 (9th Cir. 2001).

22        Applying the several Hudson factors to the evidence before the Court leads to the

23   conclusion that the force used by defendants did not violate Plaintiff's Eighth Amendment rights

24   because Plaintiff has failed to offer specific facts and/or nonconclusory allegations which show

25   that Defendants Harmon, Williams and Rush were sadistic and malicious in their use of force.

26   See Jeffers v. Gomez, 267 F.3d 895, 911 (2001).

27

28

07cv0277

1          1.   *First Incident*

2          Taking the evidence in the light most favorable to Plaintiff, it is clear that there was a need

3   for some application of force regarding the first incident.[5]   The Ninth Circuit has held that "the

4   force that was applied must be balanced against the need for that force: it is the need for force

5   which is at the heart of the [excessive force determination]." Alexander v. City and County of

6   San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994). Where is no need for force, any force used is

7   objectively unreasonable for constitutional purposes. See P.B. v. Koch, 96 F.3d 1298, 1303-04 &

8   n. 4 (9th Cir. 1996).  The law makes clear that a mere dispute over the reasonableness of a

9   particular use of force or the existence of arguably superior alternatives does not amount to a

10  triable issue of fact.  See Whitley v. Albers, 475 U.S. 312.  Further, physical force used by prison

11  staff against inmates does not constitute an Eighth Amendment violation when it is used in

12  proportion to the requirements of a given situation. Hoptowit v. Ray, 682 F. 2d 1237, 1251 (9th

13  Cir. 1982).

14         Plaintiff does not dispute that in the first incident, Defendant Harmon used physical force in

15  an attempt to physically move Plaintiff after Plaintiff refused to exit his cell.  (Doc. No. 44-3 Ex.

16  A at 7.)  The need for application of force is clear as Plaintiff states he was informed that a cell

17  search would take place and thereafter refused to comply with the order from Defendant Harmon

18  because "that has never been done any time I was in the ASU."  (Doc. No. 44-3 Ex. A at 2.)

19  Plaintiff also admits in his deposition testimony that he knows that "they" have rules and

20

21         5.  By way of review, Plaintiff claims Defendant Harmon physically assaulted him after
22  entering Plaintiff's cell following Plaintiff's refusal to exit. (Doc. No. 1 Compl. at 3.) Specifically,
    Plaintiff claims that Defendant Harmon told him to exit the cell for a cell search and when Plaintiff
23  requested an explanation, Defendant Harmon "rushed into the cell" and hit Plaintiff's mid-section
    with his forearm while attempting to pull Plaintiff out of the cell.  (Doc. No. 44-3 Ex. A at 5.)
24  Defendant Harmon's version argues that upon grabbing Plaintiff's left arm in an attempt to pull him
    out of the cell, he felt himself being pulled inside the cell.   (Doc. No. 44-6 Harmon Decl. ¶ 8.)
25  Defendant alleges that the force used by him was a measured response to the situation, and that he
    acted in a defensive manner. (Doc. No. 60 Supp. Opp. at 18.)  With regard to Defendants Williams
26  and Rush, Plaintiff alleges that while he was wrestling with Defendant Harmon in the cell,
27  Defendants Williams and Rush came into the cell and grabbed his legs and lower body to restrain
    him from further movement.  (Doc. No. 1 Compl. at 3.)

28

9

regulations that permit searches whenever they have a suspicion to search the cell.  "[Most] of the time they'll do a search, random search of different cells."  (Doc. 44-3 Ex. A at 3.)  If Plaintiff understands that such searches are appropriate,[6/] then Plaintiff had no reason to refuse an order to exit the cell so that such a search may be completed.[7/]  Furthermore, Plaintiff admits that Defendant Harmon directed Plaintiff to "step out of the cell" for the specific purpose of a cell search prior to this incident and Plaintiff's own witnesses, specifically Inmate Perez, declare that once Plaintiff was told to step out of the cell, he refused to do so with an expletive directed at Defendant Harmon.  (See Doc. No. 56-6 Perez Decl.; Doc. No. 56-2 Stevenson Decl.)  In addition, the declarations and statements regarding that first altercation consistently indicate that Defendant Harmon only used force to subdue and restore control over Plaintiff *after* he began to resist and pulled Defendant Harmon into the cell.

It is well settled that when confronted with a disturbance, prison guards are permitted to use reasonable force to restore order within the prison and prevent a threat to prison workers, administrators, visitors and other inmates.  Hudson, 503 U.S. at 3.  Plaintiff's main argument for

---

6.  Though not an issue for the purposes of this motion, this Court relies on an ample body of case law indicating that such random searches of inmate quarters are permissible within the prison context.  See Macro v. Commonwealth, 222 Va. 754, 757 (1981) (quoted with approval in Hudson v. Palmer, 468 U.S. 517, 529 (1984))  ("Random searches of inmates, individually or collectively, and their cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates and all others within its boundaries."); see also Hudson v. Palmer, 468 U.S. at 527-28 ("A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."); see also Bell v. Wolfish, 441 U.S. 520, 545 (1979) ("[I]t is also clear that imprisonment carries with it the circumscription of loss of many significant rights.")

7.  The overriding theme of the portions of Plaintiff's deposition testimony submitted to this Court was that he refused to comply with the order to exit the cell because this was not "protocol." (Doc. No. 44-3 Ex. A at 5.)  Unfortunately, the law does not support Plaintiff's actions. In White v. Roper, 901 F.2d 1501, 1507 (9th Cir. 1990), the court determined that officers had used reasonable force in subduing a prisoner who refused to enter his cell. The prisoner would not enter the cell due to his fear of the other inmate. Id. The court held that regardless of his motives, the prisoner's action created the need to apply reasonable force and that the prisoner was not harmed as evidenced by his failure to request medical treatment for the cuts and bruises he allegedly suffered. Id. The present facts evidence a similar justification for forcible restraint and the level of force applied.

07cv0277

excessive force during this altercation is based on the fact that there was no prison disturbance and he was in restraints the entire time the force was applied to subdue him.  (Doc. No. 56 Opp. at 3.) Essentially, Plaintiff is contesting the validity of the "threat reasonably perceived by responsible officials."    Hudson, 503 U.S. at 7 (citing to Whitley, 475 U.S. at 321.)  The Whitley Court, however, cautioned that in weighing this factor, Courts should be mindful that "in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." Whitley, 475 U.S. at 320. In addition, "[d]espite the weight of these competing concerns, corrections officers must make their decisions in haste, under pressure, and frequently without the luxury of a second chance." Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320)."[U]nder the Eighth Amendment, [the court] look[s] for malicious and sadistic force, not merely objectively unreasonable force." Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002).  The "malicious and sadistic" standard applies to all allegations of excessive force in the prison context and the Supreme Court has not required, as a threshold matter, a finding that an emergency situation, such as a riot or lesser disruption, existed.

However, the absence of an emergency may be probative of whether the force was indeed inflicted maliciously or sadistically for the very purpose of causing harm. Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993). Here, although a refusal to follow an order is not technically an emergency, Plaintiff's act of resistance obviously precipitated the situation that ensued in which Defendants attempted to restrain his entire body.   Even though handcuffed, Plaintiff admittedly pulled away from Defendant Harmon after Defendant Harmon's first attempt to pull him out of the cell.  (Doc. 44-3 Ex. A at 5.) Even assuming that Defendant did rush into the cell after the initial refusal to exit, this fact alone does not indicate a constitutional violation. Plaintiff does not challenge the fact that, at the time, his conduct did amount to an unequivocal refusal to obey a direct order.  (Doc. No. 44-3 Ex. A at 7.)  Defendant Harmon's act of pulling on Plaintiff's arm to remove him from the cell, although more forceful than a mere shove, was reactionary and not malicious or sadistic, nor intended to cause harm.  This act of exerting physical force to remove

07cv0277

1    Plaintiff from his cell appears adequate to maintain institutional security.  Moreover, Defendants

2    Williams and Rush, arriving after the altercation had begun,  responded as any reasonable

3    corrections officer would in similar circumstances in restraining and preventing Plaintiff from

4    further resisting Defendant Harmon.

5         The Court also considers the relationship between the need to apply force and the amount of

6    force used. Hudson, 503 U.S. at 7.  Here, even viewing the evidence proffered in the light most

7    favorable to Plaintiff,  the relationship between the need to use force and the amount of force

8    used by Defendants is a close one.  Plaintiff states in his own Grievance complaint that

9    Defendants' actions during the scuffle in the cell consisted of grabbing his upper left arm,

10   locking the handcuffs behind his back and subsequently having Plaintiff's head "wedged

11   between [Officer Harmon's] forearm and the concrete wall."  (Doc. No. 1 Ex. A-2.)  These

12   actions are not disproportionate to the amount of force needed to subdue a non-complying

13   inmate especially in light of the fact that Plaintiff had contested the validity of a cell search and

14   had resisted Defendant Harmon's initial attempts to pull him out of his cell in order to conduct

15   that search.  The facts alleged indicate that force was used to maintain or restore discipline

16   because plaintiff was refusing a direct order and had specifically advised Defendant Harmon that

17   he would not exit the cell.

18        In order to meet his burden on summary judgment, Plaintiff bears the burden of setting

19   forth specific facts in support of his contention that a dispute exists as to whether force was

20   applied maliciously and sadistically to cause harm and has failed to show, in this instance, that

21   any Defendants acted solely with the intent to cause Plaintiff harm.  In response to Defendants'

22   argument that they were merely exerting force to restrain Plaintiff, Plaintiff attempts to create a

23   genuine issue of material fact by claiming that Defendant Harmon initially beat him for no

24   reason. (Doc. No. 56 Opp. at 3.) However, Plaintiff's allegation that he was beaten for no reason

25   is not corroborated by any other testimony or other such evidence. See Villiarimo v. Aloha

26   Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) ("this court has refused to find a 'genuine

27   issue' where the only evidence presented is 'uncorroborated and self-serving' testimony")

28   (citations omitted).  In contrast, all submitted incident reports consistently state that Plaintiff was

07cv0277

resisting.  (Doc. No. 60 Exs. A-D.)  Plaintiff's own witnesses state they did not really see anything but merely heard what sounded like a scuffle taking place.  Inmate Perez states he heard "some thumping noise" and then when Defendants Williams and Rush went into the cell, he heard "more 'noise' like a scuffle."  (Doc. No. 56-6 Perez Decl. at 2.)

Plaintiff also puts forth the general and conclusory allegation that all Defendants had an improper motive for their use of force because they failed to file an incident report pursuant to Cal. Code. Regs. § 3268.1[8] documenting the fact that they used or observed non-deadly force greater than verbal persuasion following the first incident.  Plaintiff alleges that this failure to file an incident report mandates an inference that Defendants' actions were in bad faith, however, Plaintiff offers no evidence that there was any such failure to file.  The events of June 11, 2006 transpired over a span of a few hours, at most, and following the conclusion of the second incident and subsequent medical examination, Defendant Harmon proceeded to file a Rules Violation Report CDCR 115 for "Battery on a Peace Officer" detailing events that took place on that date.  (Doc. No. 60 Ex. I.)  All told, less than 24 hours elapsed between the incidents and Defendant Harmon's filing of this Report because a General Chrono Report of June 12, 2006 relays information about Plaintiff's fear of retaliation following the filing of a report to Correctional Lieutenant Stanford.  (Doc. No. 60 Ex A.)  Moreover, Defendant Rush states "it is the custom and practice at Calipatria State Prison not to pile on rule violation reports. This means that when an inmate commits many instances of misconduct in a single day, the most serious one is generally reported."  (Doc. No. 60 Supp. Opp. Ex. B at 24.)  Plaintiff offers no evidence to dispute that fact.  The failure to file a report of a particular incident on a day in which two occurred does not, by itself, permit an inference that Defendants had a malicious and sadistic intent.  Although Plaintiff's complaint, liberally construed, claims that the force used in

---

8. California Code of Regulations § 3268.1 states: " Reporting and Investigating the Use of Force: (a) Reporting Non-Deadly Force. (1) An employee who uses or observes non-deadly force greater than verbal persuasion to overcome resistance or gain compliance with an order shall document that fact. The document shall identify any witnesses to the incident and describe the circumstances giving rise to the use of force, and the nature and extent of the force used. The employee shall provide the document to his or her immediate supervisor.

07cv0277

1   restraining him was excessive and not in good faith, that is not enough at this stage of the

2   proceedings.  On summary judgment, a plaintiff must come forward with substantive probative

3   evidence in support of his or her allegations. This plaintiff fails to do.

4       In the instant action, an application of the Hudson factors to the facts surrounding the first

5   incident of alleged use of force, viewed in a light most favorable to Plaintiff, indicates that

6   Plaintiff has failed to establish a constitutional violation. The facts presented establish the need

7   for some force, i.e., Plaintiff disobeyed a direct order to exit his cell for the purpose of a lawful

8   search; and the force used was reasonable in relation to the need for force, i.e., Plaintiff was

9   restrained by his arms and legs and taken from the segregation unit.

10          2.   *Second Incident*

11      The second instance of alleged excessive use of force occurred during Plaintiff's escort

12  back to his cell.  Plaintiff contends that while being escorted back to B-Pod he felt blood

13  dripping from his arm and wanted MTA Bell to "take note of this cut."  (Doc. No. 1 Ex. A-2.)  It

14  is at this time that Plaintiff began to turn back towards the medical unit on his own without being

15  given permission to do so.  (Id.)  Upon his perceived attempt to return to the medical unit,

16  Defendants Harmon, Rush, Williams and Velasco attempted to restrain Plaintiff by pulling on

17  his triangular restraints in order to minimize his mobility and taking him to the ground to prevent

18  a possible escape.  (Doc. No. 1 Ex. A-2.)

19      With respect to the need for application of force, as a preliminary matter, there is no

20  apparent dispute that plaintiff was informed that he would be taken back to his cell, the medical

21  examination he requested would be administered there, and that he turned around to go back to

22  the medical clinic without being given permission to do so.  (See Doc. No. 44-3 Ex. A; Doc. No.

23  1 Ex. A-1, A-2.)  Plaintiff's admitted refusal to comply with these directives, even if he did so

24  out of concern for his well being, arguably created a need for the use of some force "to maintain

25  or restore discipline." See White v. Roper, 901 F.2d 1501, 1507 (9th Cir. 1990) (concluding that

26  need to apply force to restrain and subdue pretrial detainee was created when detainee refused to

27  enter and moved away from a cell to which he had been assigned, even though detainee did so in

28  order to avoid being injured by the new cell mate).

07cv0277

It is undisputed that a physical altercation resulted while Defendant Velasco escorted Plaintiff from the medical clinic to Plaintiff's cell.  Corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.  Whitley, 475 U.S. at 321.  Therefore, correction officers "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (Id. at 322.)  Further, prison officials are to be accorded "wide-ranging deference" as they "must make their decisions in haste, under pressure, and frequently without the luxury of a second chance." Hudson, 501 U.S. at 6. This is so because "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners" from such violent behavior when an inmate becomes disruptive. LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993).

Here, there was a need for application of some force because even viewing inferences in the light most favorable to Plaintiff, the facts show that Defendants exerted force only to restrain Plaintiff, not to maliciously and sadistically inflict pain. Plaintiff's own account of the facts states that at the moment he turned around to return to the medical unit, Defendants "immediately tackled Plaintiff to the ground while Sgt. Velasco twist[ed] the mechanical restraints." (Doc. No. 1 Compl. at 3.)  The need for application of this force in this instance is apparent because Plaintiff admittedly attempted to return to an area of the facility to which he was not being escorted to.  The Court finds the factor of need for force weighs against Plaintiff.

Additionally, the relationship between the need for physical restraint upon Plaintiff and the method of restraint that was actually employed is a close one because by Plaintiff's own account Plaintiff was only tackled to the ground and further restrained.  (Doc. No. 1 Ex. A-2.) Moreover, Plaintiff does not dispute the following facts regarding this incident, which Defendants have supported with declarations: while Defendant Harmon was escorting Plaintiff to B-Pod, Plaintiff turned in a different direction (Doc. No. 1 exs. E-F, I; Doc. No. 44-5 Velasco Decl. ¶ 11);  Plaintiff was forced to the ground by Defendants and leg restraints were placed on him to keep him from kicking (Doc. No. 44-7 Williams Decl. ¶ 10; Doc. No. 44-6 Harmon Decl.

07cv0277

¶ 12); Defendant Velasco tightened the triangular restraints behind him (Doc. No. 44-5 Velasco Decl. ¶ 11); and Plaintiff was taken back to the medical office for further evaluation.  (Doc. No. 44-8 Rush Decl. at ¶ 15.)  Therefore, the facts undisputed by Plaintiff and supported by declarations submitted by Defendants show that Defendants were exerting force only to restrain Plaintiff.

Moreover, in a prison setting, temporary forcible restraint does not present a constitutional violation. Since routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society," only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Consequently, it is clear that when Defendants took Plaintiff to the ground and applied leg restraints, they did not exert force in a "malicious and sadistic" manner, particularly evidenced by Plaintiff's barely existent injuries.

More importantly, as to this incident, Plaintiff does not allege any type of beating or infliction of bodily harm but merely a further restriction in his movement by tightening of the restraints.  The actions of Defendants here comport with reason and are consistent with the those of a prison guard who witnessed this action and determined in the split second time frame allowable that physical force was necessary to restrain Plaintiff and prevent him from escaping to a different area of the facility.  In sum, Plaintiff has failed to show that the force used was unreasonable in relation to the threat posed.   Even accepting Plaintiff's version of the facts, as the court must at this stage, the uncontroverted evidence shows that Defendants Harmon, Williams and Rush applied force in a "good-faith effort to maintain or restore discipline" once after Plaintiff refused to come out of his cell and again after he attempted to return to the medical clinic on his own.[9]  See Hudson, 503 U.S. at 7. After careful consideration of all the

---

9. Insubordination is a matter that should be taken taken very seriously within the confines of an institutional setting. Plaintiff's refusal to comply with the direct orders of defendants likely created a need for the application of force to gain plaintiff's compliance and the force at issue was employed for the very purpose of gaining plaintiff's compliance with the order. When an inmate refuses to comply with the order of a staff member, a threat may be reasonably perceived by staff. It is undisputed that Defendant Harmon ordered Plaintiff out of his cell and Plaintiff refused. Plaintiff failed to comply with direct orders. Thus, defendants could reasonably have perceived

07cv0277

1  circumstances surrounding the incidents of June 11, 2006, there is no evidence that any force

2  was excessive or applied "maliciously and sadistically to cause harm." Id.

3      Lastly, Defendants argue that Plaintiff's overall lack of serious injury shows the absence of

4  excessive force during the course of the two incidents.  (Doc. No. 44-2 P. & A. at 7-9.)  Plaintiff

5  correctly notes that serious injuries need not be present in order to determine that the force used

6  was excessive.  (Doc. No. 60 Supp. Opp. at 5.)  However, the Court is mindful that not "every

7  malevolent touch by a prison guard gives rise to a federal cause of action."  Hudson, 503 U.S. at

8  9.  Although the absence of serious injury does not end the Eighth Amendment inquiry, Hudson,

9  503 U.S. at 7, the prohibition of cruel and unusual punishment necessarily excludes from

10  constitutional recognition _de minimis_ uses of force. Id. at 9-10.

11      In Hudson, the Court held that the injury suffered was not _de minimis_ where an inmate

12  suffered bruises, swelling, loosened teeth and a cracked dental plate as a result of a beating at the

13  hands of two guards. Id. In contrast, here, Plaintiff was examined and released without treatment

14  by a MTA who found only superficial abrasions to Plaintiff's wrists and a superficial abrasion to

15  his left knee. Plaintiff sets forth medical evidence in the form of two Form 7219: Medical Report

16  of Injury or Unusual Occurrence.  (Doc. No. 1 Ex. B-1, B-2.)  Both reports were prepared by

17  MTA Bell in his capacity as Staff Medical Technician at Calipatria State Prison and depict MTA

18  Bell's medical determination following examination after the first incident and the second.

19  (Doc. 44-4 Bell Decl. ¶ 2.)  MTA Bell notes after the first incident that Plaintiff states "I got beat

20  up" but MTA Bell can see no visible signs of injury or abrasions on Plaintiff.  (Doc. No. 1 Ex. B-

21  1.)  The only thing present worth noting during this examination is a section of dry skin on the

22  left side of Plaintiff's face.  (Id.)  MTA Bell depicts no active bleeding, no bruises and no

23  swollen areas anywhere on Plaintiff's body.  (Id.) Likewise, Form 7219 following the second

24  incident notes "superficial abrasions to bilateral wrists," a "superficial abrasion to left knee" and

25  a "small bump" on the right side of Plaintiff's forehead.  (Doc. No 1 Ex. B-2.)  Regarding this

26  examination, MTA Bell states "there was no dripping blood and no need for any bandaging."

27

28  plaintiff's disobedience and ensuing resistance to be a threat requiring the use of force.

07cv0277

(Doc. No. 44-4 Bell Decl. ¶ 9.)   MTA Bell's declaration regarding Plaintiff's injuries is persuasive because as a medical professional with authoritative credentials on the subject he would be in the best position to know and determine whether Plaintiff had suffered any injuries which required medical care or follow-up attention.  (Id. at ¶ 3.)  Moreover, MTA Bell's medical opinion declaring no serious injuries is corroborated by Plaintiff's videotaped interview of June 11, 2006.  (Doc. 63-3.)  Other than band-aids on Plaintiff's wrist and a bump on Plaintiff's head, it is difficult to see any physical injury depicted in the video.  Plaintiff also states in the videotaped interview that after the first examination with MTA Bell, he did not report any injuries.  (Id.)  Plaintiff has failed to present any further evidence which would indicate an injury such as a request for further medical treatment on the day of the incident or on any day thereafter, or evidence of an inability to perform a disciplinary work assignment or other such task, if applicable.  In similar circumstances involving prison discipline, courts have rejected excessive force claims.[10]  In the instant case, the extent of Plaintiff's injuries is not in dispute.[11]  As such, the force used appears minimal from the extent of the injury inflicted.

In sum, the Court concludes that Plaintiff has not presented any evidence sufficient to raise a triable issue of material fact on his Eighth Amendment claim against Defendants for excessive use of force.  Because Plaintiff has proffered only bare allegations in support of his claims that the defendants used excessive force, these issues need not be tried.  There is no evidence that Defendants acted maliciously and sadistically for the very purpose of causing harm. Rather, the

---

10.  See Turner v. Contra Costa County, 1997 U.S. Dist. LEXIS 21512,* 1-2 (N.D. Cal. 1997) (shoving an inmate because he is not moving fast enough does not amount to an Eighth Amendment violation); Jackson v. D.D. Hurley, 1993 U.S. Dist. LEXIS 16954, *2 (N.D. Cal. 1993) (striking plaintiff in the back of the neck and kicking his ankle is merely a *de minimis* use of force); see e.g., Boddie v. Schnieder, 105 F.3d 857, 861 (2nd Cir. 1997) (bumping, grabbing, elbowing, and pushing plaintiff do not approach an Eighth Amendment claim); Olson v. Coleman, 804 F.Supp 148, 150 (D. Kan.1992) (holding that a single blow to the back of the head while prisoner was handcuffed during transport does not constitute excessive force).

11.  As additional evidence, Plaintiff offers numerous Mental Health Interdisciplinary Progress Notes as evidence of the injuries he sustained stemming from this incident.  However, psychological injuries standing alone are generally not enough to support a claim absent something more than *de minimis* physical injury.  See Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002).

07cv0277

1   record establishes that they applied force in a good-faith effort to restore discipline and maintain

2   jail security and that the injuries inflicted were minor.  Defendants' responses under these

3   circumstances cannot be characterized as "torture" or "barbarous," even when considered from

4   the "peace of the [undersigned's] chambers." <u>Hudson</u>, 503 U.S. at 9-10. Accordingly, the Court

5   recommends summary judgment be GRANTED as to Defendants on Plaintiff's excessive force

6   claims.

7        **B.   Fourteenth Amendment–Due Process and Equal Protection**

8        Plaintiff also alleges a violation of his Fourteenth Amendment rights to due process and

9   equal protection stemming from the actions of Defendant Velasco during the second incident of

10  alleged excessive use of force.  However, Plaintiff provides factual allegations that appear to

11  state a "failure to protect" claim against Defendant Velasco for failing to prevent and intervene

12  in the incidents that occurred on June 11, 2006.  (Doc. No. 1 Compl. at 3.)  Therefore, although

13  Plaintiff pleads a Fourteenth Amendment violation of due process and equal protection claim,

14  this Court understands the gravamen of Plaintiff's allegations to constitute a "Failure to Protect"

15  Claim under the Eighth Amendment and will liberally construe it as such.  <u>See</u> <u>Leer v. Murphy</u>,

16  844 F.2d 628, 633 (9th Cir. 1988); <u>see also</u> <u>Berg v. Kincheloe</u>, 794 F.2d 457, 459 (9th Cir.

17  1986). The following discussion analyzes Plaintiff's "Failure to Protect" claim under governing

18  legal principles.

19       Under 42 U.S.C. § 1983, liability may not be imposed on supervisory personnel for the

20  actions of their employees under a theory of *respondeat superior*. <u>Taylor v. List</u>, 880 F.2d 1040,

21  1045 (9th Cir. 1989). When the named defendant holds a supervisory position, the causal link

22  between the defendant and the claimed constitutional violation must be specifically alleged.

23  <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979). "A supervisor is only liable for

24  constitutional violations of his subordinates if the supervisor participated in or directed the

25  violations, or knew of the violations and failed to act to prevent them." <u>Taylor</u>, 880 F.2d at 1045.

26       Plaintiff contends that, in front of supervisor Defendant Velasco, Defendants Harmon,

27  Williams and Rush utilized excessive force to subdue Plaintiff following his attempt to turn

28  around and return to the medical unit.  (Doc. No. 1 Compl. at 4.)  As such, Plaintiff argues that

07cv0277

1    Defendant Velasco is personally liable because he "knew Plaintiff faced a substantial risk of

2    serious harm and disregarded that risk by failing to take reasonable measures to abate it." (Doc.

3    No. 56 Opp. at 13.)

4         The Eighth Amendment requires that prison officials take reasonable measures to protect

5    inmates from serious risks to their health and safety. Farmer v. Brennan, 511 U.S. 825, 837

6    (1970); Helling v. McKinney, 509 U.S. 25, 33-34 (1993). There is no question that prison

7    officials have a general duty to protect prisoners from violence. Farmer, 511 U.S. at 833. For

8    Defendant Velasco to be held liable in his individual capacity, Plaintiff must demonstrate that

9    the harm was "objectively, 'sufficiently serious,'" and that Defendant Velasco had a culpable

10   state of mind described as "deliberate indifference." (See id. at 834) (citations omitted.) The

11   "deliberate indifference" standard contains separate objective and subjective elements. A prison

12   official is deliberately indifferent when the official has actual, subjective knowledge of an

13   excessive risk of harm to the prisoner's safety and fails to prevent it. Id. at 837-39. As for the

14   objective element, a substantial risk of serious harm exists only when a "prison official's act or

15   omission...result[s] in the denial of 'the minimal civilized measure of life's necessities.'"

16   Farmer, 511 U.S. at 834; see, e.g., Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996)

17   (observing that officials must protect against "reasonably preventable assault" rather than a "fear

18   of assault").

19        Turning to Plaintiff's allegations, the Court considers whether Plaintiff has come forward

20   with specific facts showing that Defendant Velasco would have any reason to believe that a

21   substantial risk of serious harm to Plaintiff's safety existed and that he failed to prevent it. In his

22   Complaint, Plaintiff states that he "inform [sic] Sgt. Velascon [sic] that he was just attack [sic]

23   by the Defendants." (Doc. No. 1 Compl. at 4.) Plaintiff sets forth no evidence showing that

24   Defendant Velasco should have regarded this "information" as constituting a "substantial risk"

25   to Plaintiff's safety. Nevertheless, at the very least, Plaintiff did identify the threat he faced and

26   communicated this threat to Defendant Velasco. Because the court does not weigh evidence on

27   summary judgment and Plaintiff is the nonmoving party, Plaintiff's statements are taken as

28   genuine. Anderson, 477 U.S. at 249.

07cv0277

However, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.  <u>Farmer</u>, 511 U.S. at 844.  Even assuming that Plaintiff had established that Defendant Velasco had knowledge of a risk to Plaintiff's safety, Defendant Velasco has presented evidence that he acted reasonably to respond to the danger to Plaintiff. Upon learning that Plaintiff "feared for his life," Defendant Velasco brought Plaintiff to the medical office to make certain he was not injured and thereafter personally escorted Plaintiff back to his cell.  (Doc. No. 44-5 Velasco Decl. ¶ 2.)  Plaintiff states in his own Complaint that Defendant Velasco instructed Officers Harmon and Williams to leave the staff corridor area after being informed of the first incident.  (Doc. No. 1 Compl. at 4.)  Plaintiff's Opposition to this Motion further corroborates this fact by stating that after he informed Defendant Velasco about the assault, Defendant Velasco "dismiss [sic] Defendant Harmon and Williams from the holding cage."  (Doc. No. 56 Opp. at 12.)  Plaintiff has pointed to no evidence which establishes that Defendant Velasco did not act reasonably to respond to the danger to Plaintiff.  <u>See</u> <u>Anderson</u>, 477 U.S. at 261 n. 2; <u>see also</u> <u>Mosher v. Saalfield</u>, 589 F.2d 438, 442 (9th Cir. 1978).  The evidence set forth by Plaintiff, even taken in the light most favorable to him, does not show that Defendant Velasco was aware of an excessive risk to his safety and affirmatively chose to disregard it because he took steps to alleviate Plaintiff's fears by performing the escort from the medical clinic himself.  (Doc. No. 44-5 Velasco Decl. ¶ 10.)  Defendant Velasco's failure to prevent the conduct of correctional officers under his command is insufficient to rise to the level of deliberate indifference.  Plaintiff has merely stated in a conclusory fashion that because he was subjected to excessive force a second time, Defendant Velasco is responsible.  (Doc. No. 1 Compl. at 4; Doc. No. 60 Supp. Opp. at 7.)  Nothing in Plaintiff's proffered evidence permits a reasonable inference that Defendant Velasco was "deliberately indifferent" to Plaintiff's safety when he failed to prevent the second incident of force upon Plaintiff.

Accordingly, the Court finds that Defendant Velasco did not fail to protect Plaintiff from a substantial risk of serious harm by the other Defendants and Defendants' motion should be GRANTED as to this claim.

07cv0277

1

**C.   Governmental Immunity**

2       Plaintiff has brought suit against all Defendants in both their official and individual

3   capacities for money damages.  (Doc. No. 1 Compl. at 2.)  Defendants contend they cannot be

4   sued in their official capacities because they are entitled to immunity under the Eleventh

5   Amendment.  (Doc. No. 44-2 P. & A. at 9-10.)

6       To the extent Defendants are being sued as state officials acting in their official capacities,

7   the Eleventh Amendment bars Plaintiff's claims.  Will v. Michigan Dept. of State Police, 491

8   U.S. 58, 70 (1989).  The Court recommends Defendant's motion be GRANTED as to these

9   claims.

10      However, the Eleventh Amendment does not bar damage actions against state officials in

11  their personal capacities.  Hafer v. Melo, 502 U.S. 21, 31 (1991).  Personal capacity suits seek to

12  impose liability on state officials for acts taken under color of state law.  Id. at 25-26.  In Hafer,

13  the Court made clear that the Eleventh Amendment does not shield state officials from

14  allegations that they violated a federal right while acting under color of state law.  Id. at 29.  The

15  Eleventh Amendment only prohibits damage actions against the "official's office;" actions that

16  are, in reality, suits against the state itself rather than its individual officials.  Id.; Will v.

17  Michigan Dept. of State Police, 491 U.S. at 71; Stivers v. Pierce, 71 F.3d 732 (9th Cir. 1995).

18  As such, because Defendants are also being sued in their individual capacities (Doc. No. 1

19  Compl. at 2), they are still individually liable should Plaintiff prevail on his claims.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

07cv0277

**IV.**

**CONCLUSION**

For the foregoing reasons, it is hereby recommended that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **GRANTING** Defendants' Motion for Summary Judgment.

**IT IS ORDERED** that no later than **December 17, 2008**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objection shall be filed with the Court and served on all parties no later than **December 31, 2008.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: November 25, 2008

_____
Peter C. Lewis
U.S. Magistrate Judge
United States District Court

cc:    The Honorable Thomas J. Whelan
       All Parties and Counsel of Record

07cv0277